## Sisters of the Blessed Sacrament for Indians and Colored People, Appellant, v. Philadelphia.

Argued November 26, 1963. Before BELL, C. J., MUSMANNO, JONES, COHEN, O'BRIEN and ROBERTS, JJ.

reargument
refused February 19, 1964.

*Emanuel Friedman,* for appellant.

*Matthew W. Bullock, Jr.,* Deputy City Solicitor, with him *Augustus R. Sigismondi,* Assistant City Solicitor, *James L. Stern,* Second Deputy City Solicitor, and *Edward G. Bauer, Jr.,* City Solicitor, for City of Philadelphia, appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 8, 1964:

The plaintiffs in this case, The Sisters of the Blessed Sacrament for Indians and Colored People, owned, prior to April 14, 1954, some 71 acres of land fronting on Byberry Street and along Poquessing Creek, in the county of Philadelphia. On that date the City of Philadelphia by appropriate ordinance condemned 11.216 acres of the tract for the purpose of laying an intercepting or collecting sewer through the property. A board of view, made up of three competent, professional real estate men, appointed by the Court of Common Pleas of Philadelphia, examined the land, studied the plans, took testimony and arrived at the conclusion that the installation of the described intercepting sewer damaged the value of the plaintiffs' property to the extent of $23,094. The City appealed from this award to the court of common pleas, at which time, it declared in answering the plaintiffs' complaint, that the damages suffered by the plaintiffs in this project amounted to $5600. During the trial it amended its

answer, averring that the plaintiffs were not entitled to any damages.

At the termination of the trial the jury returned a verdict for the defendant city and the plaintiffs have appealed, asking for a new trial. The new trial must be granted.

The defendant's only witness as to value of the property before and after the taking was a real estate appraiser Samuel Beck who testified that the plaintiffs suffered no damage through the taking but, on the contrary, the value of the property had augmented $48,400 because of the sewer laid therein. The reason he gave for this enhancement in market value was that the sewer "is available to this land because the sewer is available to it as soon as it is installed."

He was of the impression, and so stated, that the owner of land which accommodates a sewer line has an advantage over a landlord of land which is not contiguous to a sewer line in that the former may develop and exploit his land at once. The strange thing about the final disposition of this case in the court below is that not only was Mr. Beck's conclusion in error but that his brother witnesses for the defendant city, testified exactly to the contrary.

James F. Dillon, assistant engineer in the Project Control Division of the Philadelphia Water Department, testified that the owner of a property equipped with an interceptor sewer may not of his own volition connect up pipes with that sewer. He was asked by City counsel to repeat what he had said about the requirements for connecting into a collecting sewer, and he replied: "First of all, the plans must be approved by the City Planning Commission. An official city plan would be made showing the official grade or the final grade, the width of the streets, the alignments that would be confirmed on the city plan by the board of surveyors. *Then an ordinance would be introduced au-*

*thorizing construction of branch sewers in the streets. They would gradually travel the street network to reach the intercepting sewer."* (Emphasis supplied.)

Samuel S. Baxter, registered civil engineer, Commissioner and Chief Engineer of the Philadelphia Water Department, testified that a developer of land with a sewer already installed on it, might have to wait for from 12 to 24 months to obtain the necessary municipal authorization to tie into that sewer. Yet according to Beck, who had no official position in the City, the owner of sewer-laid land could tie into it with branches and individual pipes as easily as the owner of coal-laden land could dip down into the vein and take away as much coal as he wished.

The trial court was skeptical about the ease with which Beck said an owner of land could break into a city-laid sewer and questioned him on the subject: "Q. How about the branch sewers to be put under Byberry Road? A. We did not need branch sewers for this property to go right into the intercepting sewer. Q. To my mind, that is significant and important? A. It is important that you go right into this sewer. Q. You would go right in without having to wait for the City? A. That's right . . ."

While, of course, it is possible that where only a single lot is involved, a property owner could prevail upon the municipality to be allowed to connect up with a sewer already laid, and Mr. Baxter so testified, but that was not the situation here, nor was it on such a basis that Beck testified. In fact, Mr. Baxter made it very clear that where the development of an entire project was possible (which was the basis on which Mr. Beck made his evaluation) such permission would not be granted forthwith and that the usual procedure would have to be followed with an ordinance duly enacted authorizing the tie-up.

The city argues that the conflict of testimony between what Beck said and what the other city wit-

nesses testified to, was only a question of credibility which was resolved by the jury. This is an oblique view of realities. What was involved in this particular phase of the case was not alone credibility of testimony but *competence* of testimony. In *Baker v. Commonwealth,* 401 Pa. 512, an expert witness testified that he considered sentimental loss in arriving at his conclusion as to loss in market value and that he did not consider the effect of the taking of the land as a whole. This Court held that such testimony was incompetent, should have been stricken from the record and the jury told in clear and explicit language to disregard it: "While the jury later, in the course of the charge, was instructed that no sentimental values were to be considered in fixing the amount of the damage suffered and the trial court further stated, in reference to the testimony of the witness, 'I am going to let you consider what he said, but his evidences of value, we cannot consider them', this was not sufficient. The testimony of the witness was incompetent . . . Its doubtlessly prejudicial effect on the Commonwealth's case rendered its improper admission reversible."

Aside from the trial error just discussed, the plaintiffs are entitled to a new trial on the basis that the verdict was against the weight of the evidence, and the plaintiffs moved for a new trial on that specific charge. Not only did the plaintiffs' two expert witnesses testify that the property had depreciated in value in the respective sums of $38,500 and $41,900, but there was also specific evidence that the property suffered physical damage which could not but affect its market value. In digging trenches for the sewer, the City not only tore away trees and soil, but it now has the right under its easement to dig up the ground any time it wishes. A city witness testified: "The easement is for the purpose of constructing, maintenance, operation and reconstruction, if necessary, and if we have to dig it up, we want that right."

To say that a land which may be churned up at the will of someone other than the landlord and turned into a shambles at someone else's will, has not lost any market value, is peculiar reasoning, to say the least. In addition, the City has decorated the plaintiffs' property with numerous manhole covers.

But that is not all. Under its right of easement, the City may turn the plaintiffs' property into a recreational area. A City witness testified that the land could be used for camping, recreational activities, outdoor gatherings, picnics with tables and benches. In addition, the City would permit the laying out of a baseball field and the building of shacks. To say that the tumult, shouting, yelling and littering which would accompany the activities mentioned would not affect the market value of a residential property is to wear dark glasses and ear plugs.

As already stated, the board of view, which was wholly a body of impartial, professional men, awarded the plaintiffs $23,094. The jury at the common pleas trial awarded zero. This shocking disparity as to values is something which cannot be slightly regarded. While it is true that a jury may not be told of the results reached by a board of view, an appellate court is not restricted in its consideration of the record to see that justice is done in accordance with law. In *Mazur v. Commonwealth*, 390 Pa. 148, we said: "The court [the trial court] also noted the very wide disparity between the jury's verdict and the amount of damages awarded by the board of viewers, saying, in this connection, that, 'While the amount as found by the Board of View is not binding in any sense upon the Court, nor is it relevant testimony in the trial of the case upon an appeal from the action of the Board of View, yet it is a fair indication of the amount of damages suffered by the land owners and on a motion for a new trial should be considered where the new trial is urged upon

the grounds that the verdict of the jury was inadequate as in the case at bar.' The reasoning is, of course, sound." In *Baker v. Commonwealth,* 401 Pa. 512, we remarked: "In the instant case there was substantial variance between the award of the viewers and that given by the jury. While this factor is not controlling, it is a circumstance to be considered in a situation as herein presented."

Among its reasons for a new trial, the plaintiffs averred that they learned, subsequent to the trial, that in January, 1962, the city had asked a real estate expert, John J. Reilly, to make an appraisal of the loss in market value of the plaintiffs' property, and that he assessed the damages to be $14,000. When one considers that the city had admitted in its sworn answer that the plaintiffs had sustained damages to the extent of $5600, it might have been enlightening to learn what another city expert had said with regard to loss in market value. The lower court refused the plaintiffs' request for presentation of after-discovered evidence, by stating that Reilly's appraisal was made eight years after the taking and that, therefore, its probative value would be remote. Yet the city accepted implicitly Mr. Beck's evaluation, and Mr. Beck did not make his appraisal until 10 months *subsequent* to Reilly's appraisal. What is sauce for the goose cannot be transformed into squash for the gander.

Reversed with a venire facias de novo.

Mr. Justice COHEN dissents.