# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEBORAH HARKER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-1097-SEM |
| | ) | |
| KWANZA GRIMES and | ) | |
| ASHLEY VOGEL, individually and | ) | |
| as attorney in fact for | ) | |
| BETTY B. HARKER | ) | |
| | ) | |
| Respondents. | ) | |

Report: March 7, 2025
Date Submitted: September 18, 2024

## POST-TRIAL REPORT

Jason C. Powell, Thomas J. Reichert & Laurel A. Lalone, THE POWELL FIRM LLC, Wilmington, DE; *Counsel for Petitioner*.

Tiffany M. Shrenk, MACELREE HARVEY, LTD, Centreville, DE; *Counsel for the Respondent Kwanza Grimes*.

Ashley Vogel, Wilmington, DE; *Pro se* Respondent.

**MOLINA, Senior Magistrate**

Delaware law protects the rights of adults to dispose of their property as they see fit and to associate with those of their choosing. Through this action, I am asked to second guess the late Betty Bell Harker's exercise of her personal autonomy. Per Ms. Harker's daughter, certain decisions Ms. Harker made near the end of her life were done either without capacity, or with such weakened intellect that the objects of her affections overcame Ms. Harker, causing her to act not of her own free will, but for others' self-serving objectives.

Those "others" were Ms. Harker's beloved grandson and his wife. Over four days of trial, I heard candid and concerning testimony about the struggles and motivations of Ms. Harker's prized grandson. Endeavoring to provide "factual findings . . . sufficient to support" my ruling, as required under Court of Chancery Rule 144(b)(2), I delve arguably too deeply into the difficult personal situations facing Ms. Harker and her kin. But even as the details risk bordering on the scandalous, the evidence before me supports the unshakeable conclusion that Ms. Harker chose to spend her life caring for, and catering to, her grandson. Her support, both personally and financially, was unwavering. To overcome this definitive pattern and undo Ms. Harker's final actions, which were consistent therewith, her daughter needed to make a conclusive showing that Ms. Harker lacked capacity or had her true will overcome. The evidence for either is lacking.

Through this post-trial report, I reject the daughter's challenges to Ms. Harker's estate planning. But the daughter has demonstrated that Ms. Harker's grandson and his wife breached their fiduciary duties to Ms. Harker, and thus various of their self-serving transactions should be voided. The benefit this will provide to the estate, and the good faith nature of the daughter's challenge given the concerning circumstances of Ms. Harker's final days, support shifting Ms. Harker's attorneys' fees to Ms. Harker's estate. In essence, although I will not set aside Ms. Harker's decision to disinherit her daughter, I hereby shift the grandson and his wife's ill-gotten gains back to the estate, which shall bear the daughter's cost of litigating this difficult case.

## I. BACKGROUND[1]

This action revolves around Betty Bell Harker, who passed away at the age of 94 on June 14, 2022.[2] Those who loved Ms. Harker described her as "an intellectual. She was an academic, and she coupled that with a tremendous understanding of the adolescent mind. . . . [S]he was just one of the finest human beings[.]"[3]

Ms. Harker was predeceased by her husband Robert S. Harker, whom she met while they attended West Virginia University.[4] In 1968, the Harkers moved to Wilmington, Delaware, to lay down their roots and build their forever home at 2003 Dogwood Lane (the "Property").[5]

---

[1] The facts in this report reflect my findings based on the record developed at the trial held on May 8–10 and 20, 2024. *See* Docket Item ("D.I.") 138, 140. I grant the evidence the weight and credibility I find it deserves. Citations to the first three days of trial's transcript, D.I. 143–45, are in the form of "[Last name] Tr.," referring to the testimony of the identified person. Defined parties are identified with that designation. Citations to the fourth day of trial's transcript, D.I. 146, are in the form of "[Last name] TT," again referring to the testimony of the identified person and incorporating defined parties. Citations to the joint exhibits are in the form of "JX__." The Respondent argues that JX51–53 should be stricken and disregarded under Delaware Rules of Evidence 401, 402, 403, and 609, as well as the hearsay rules. *See* D.I. 158 at 62–65; Tr. 313:14–315:24. I do not rely on these three joint exhibits for purposes of this decision, and thus the objections are moot.

In this report, I use first or last names in some instances to avoid any confusion; I intend no disrespect or familiarity. I have also opted for the term "Respondent" to describe Kwanza Grimes, because I held the other respondent, Ashley Vogel, in default. I address herein the effect of that default, and the process for calculating the judgment to be entered against Ms. Vogel.

[2] D.I. 132 ("Pretrial Order") at p. 7 ¶ 30.

[3] *See* McLaughlin Tr. 424:20–425:2.

[4] Petitioner Tr. 188:8–10.

[5] *Id.* at 189:7–9.

Together, the Harkers bore two children: Deborah Harker (the "Petitioner"), their eldest, and Stephen Harker.[6] Stephen passed away in 2023, while this action was pending.[7] He and Ms. Harker were long estranged. But Ms. Harker, until the very end, remained close with the Petitioner. The true apple of Ms. Harker's eye, though, was the Petitioner's son, Ms. Harker's grandson Kwanza Grimes (the "Respondent").

## A. The Respondent

The Respondent was born in 1980.[8] When he turned nine, the Petitioner and the Respondent's father went their separate ways.[9] But the Respondent and the Petitioner were not alone; the Harkers adored their grandson.[10] While the Respondent was growing up, he spent weekends, summers, and holiday breaks with his grandparents.[11] Ms. Harker lavished the Respondent with new clothes, bikes, shoes, toys, and even a car when he turned sixteen.[12] But her contributions were not solely financial or material. For example, when the Respondent was not receiving

---

[6] *Id.* at 187:10–13.

[7] *Id*. at 187:11.

[8] *See id.* at 189:17 (identifying the Respondent's age as 43, though he would turn "44 in September").

[9] *Id*. at 189:21–22.

[10] *Id*. at 189:23.

[11] *Id*. at 189:22–190:3; Respondent Tr. 712:19–22.

[12] Respondent Tr. 713:3–15, 714:3–21, 715:16–716:8.

enough playing time on the Sanford basketball team, Ms. Harker attempted to pull some strings.[13] She wanted the Respondent to have it all.

Suffice it to say, Ms. Harker played a large role throughout the Respondent's adolescence. [14] The Respondent characterized his upbringing as a "great childhood."[15] But the Petitioner worried that Ms. Harker's frequent spoiling was an impediment to the Respondent's development into an adult.[16]

Her concerns were valid. The Respondent candidly testified regarding his struggles transitioning into adulthood. And, in 2000, the Respondent developed a drug addiction after he was prescribed pain medication to treat a shoulder injury.[17] Though he testified that he stopped using the prescription medication after about a year, the Respondent struggled for quite some time, into and after his marriage.

---

[13] McLaughlin Tr. 426:19–22.

[14] Ms. Harker even went so far as to seek guardianship of the Respondent, though the Petitioner refused to allow it. Petitioner Tr. 340:5–11.

[15] Respondent Tr. 713:16.

[16] *Id*. at 720:5–9.

[17] *Id*. at 720:18–721:6.

Six years after his addiction began, the Respondent married Ashley Vogel.[18] Not long thereafter, Ms. Vogel also began struggling with substance abuse and addiction.[19] Then came the couple's financial issues.[20]

In or around the late 2000s, the Respondent and Ms. Vogel lost their home and began living in and out of motel rooms.[21] During this time, the Petitioner tried to help, providing them with food and paying for their motel rooms or security deposits.[22] While the Respondent was working, he turned to medical professionals to treat his addiction.[23] Unfortunately, the Respondent's work was sporadic and he relapsed for three years.[24] During these tough years, though, the Respondent continued to have the support of the Petitioner and Ms. Harker.

Sometime in or around 2014, the Petitioner offered the Respondent and Ms. Vogel the opportunity to live in the Petitioner's home in Chesapeake City, Maryland, on the condition that they worked and paid the bills.[25] The couple moved in, but did

---

[18] Petitioner Tr. 190:23–192:2.

[19] Respondent Tr. 721:7–13, 722:15–723:10.

[20] *Id.* at 721:14–722:9.

[21] *Id*. at 721:20–23.

[22] Petitioner Tr. 194:17–21; Respondent Tr. 721:20–23.

[23] Respondent Tr. 721:24–722:3.

[24] *Id*. at 722:4–9.

[25] Petitioner Tr. 190:17–21, 191:10–12.

not keep up their end of the bargain.[26] While living in Maryland, the couple's drug addiction took off, the trash bins were overflowing, the neighbors were complaining, and they were constantly fighting.[27] Ultimately, the Petitioner gave the Respondent and Ms. Vogel an ultimatum—the Respondent could stay in the house but Ms. Vogel could not.[28] The Respondent decided to remain loyal to Ms. Vogel, and the two moved out of the Chesapeake City house and back into motel rooms.[29]

Eventually, the couple seemed to be doing better and were making positive strides.[30] They took steps to become financially independent, attended counseling and were working in Baltimore while living in Elkton, Maryland.[31] Then a few years later, the Respondent and Ms. Vogel moved to Edgewood, even closer to Baltimore, and things seemed stable.[32]

Then came the COVID-19 pandemic. The Respondent and Ms. Vogel both lost their jobs and, after getting into an altercation with another neighbor's boyfriend, the Respondent and Ms. Vogel moved out of Maryland and into a hotel room in

---

[26] *Id*. at 190:19–21.

[27] *Id.* at 191:1–6.

[28] Respondent Tr. 724:4–6.

[29] *Id.* at 724:6–10.

[30] Petitioner Tr. 194:22–195:3.

[31] *Id.*

[32] Respondent Tr. 745:13–22.

Delaware.[33] But by this time, and as more fully addressed below, Ms. Harker was living in the Petitioner's home, leaving the Property empty. With the couple needing a more permanent place to stay and Ms. Harker worried about the upkeep of the Property, it seemed destined that, by May of 2020, the Respondent and Ms. Vogel moved in.[34]

While the Respondent and Ms. Vogel were living at the Property, Ms. Harker paid the majority of the Property's bills such as housekeeping, taxes, and utilities; the Petitioner also assisted by paying for the couple's internet.[35] Throughout 2020, the Respondent would talk on the phone with Ms. Harker periodically and attempted to visit the Petitioner and Ms. Harker during the holidays.[36] His visits were infrequent, though, because the Petitioner was concerned about Ms. Harker contracting COVID through visits.[37]

Unfortunately, even with their expenses largely paid, the couple floundered while at the Property. During 2020, Ms. Vogel suffered a miscarriage, relapsed, and would disappear for periods of time in search of drugs.[38] Ultimately, the couple

---

[33] Petitioner Tr. 195:6–15; Respondent Tr. 748:14–21. The Petitioner found the hotel room for the Respondent and Ms. Vogel. *Id*. at 749:3–12.

[34] Petitioner Tr. 195:9–15.

[35] *Id.* at 195:22–196:9.

[36] Respondent Tr. 751:20–753:4.

[37] *Id.* at 752:5–753:4.

[38] *Id*. at 844:2–845:5.

separated and, as of trial, the Respondent had no knowledge of Ms. Vogel's whereabouts.[39]

## B.     The Harkers' Estate Planning

The Harkers planned for the disposition of their estate before Mr. Harker's passing in 2011. They began, for purposes of this decision, in 2009. At that time, Mr. Harker was getting sick and wished to transfer stocks he owned into a joint account with Ms. Harker.[40] The Harkers worked with Steven Lucas at Edwards Jones to open a jointly titled account, providing the couple with rights of survivorship to the transferred assets.[41]

Then, in early 2010, the Harkers executed a set of estate planning documents with assistance from Daniel P. McCollom, Esquire.[42] The Petitioner had worked with Mr. McCollom and referred the Harkers to him for their estate planning needs.[43] The Harkers hired Mr. McCollom to create a simple will which upon their deaths

---

[39] *Id.* at 845:6–8.

[40] Lucas Tr. 130:21–131:7.

[41] *Id.* at 131:22–132:13; JX7.

[42] McCollom Tr. 350:5–6, 354:1–4.

[43] Petitioner Tr. 243:17–24.

benefitted each other, then the Petitioner, followed by the Respondent, and then two listed charities (the "2010 Documents").[44]

Later, on February 8, 2011, the Harkers designated the Petitioner as the 100% transfer on death beneficiary of their Edward Jones account.[45] That designation remained on the account when Mr. Harker died on March 17, 2011, leaving Ms. Harker as the then-sole owner of the Edward Jones account.[46]

Rather than wait until Ms. Harker's passing, the Petitioner and Ms. Harker worked with Mr. Lucas to open a new Edward Jones account for the stock, which would provide the Petitioner with immediate access. Ms. Harker and the Petitioner opened their new joint account on April 18, 2011 (the "Edward Jones Account"), which was titled in both of their names as joint tenants with right of survivorship.[47]

The Petitioner and Ms. Harker used the Edward Jones Account cooperatively. If the Petitioner or Ms. Harker needed money, such as for a home repair, they would discuss it and either would ask Mr. Lucas to liquidate appropriately.[48] Once enough stock was sold, Mr. Lucas would transfer the liquidated amount to an M&T bank

---

[44] McCollom Tr. 354:15–23, 356:19–367:4; *see* JX1 at MDSU29–56. The 2010 Documents explicitly made no provision for the Harkers' son, Stephen. McCollom Tr. 356:19–357:1; JX1 at MDSU30.

[45] JX8.

[46] Lucas Tr. 137:4–10.

[47] JX9.

[48] Lucas Tr. 149:19–150:5.

account jointly owned by Ms. Harker and the Petitioner.[49] From there, Ms. Harker or the Petitioner would use the funds freely as they wished.

The Edward Jones Account was not, however, Ms. Harker's sole asset. Thus, with Mr. Harker's passing, Ms. Harker looked to amend her estate plan. On September 27, 2019, Ms. Harker and the Petitioner met with Mr. McCollom to make changes to the 2010 Documents.[50] They discussed and explored a pour-over will to a revocable trust, which would have provided that on Ms. Harker's death, her assets would essentially pass to the Petitioner, then to the Respondent or his issue per stirpes, then to Stephen, and then ultimately to the prior two listed charities (the "2019 Documents").[51] Ms. Harker never executed the 2019 Documents, though, because she was sidelined with a medical issue, as addressed below.

Ms. Harker did, however, execute new documents in 2021. Initiated by a call from the Respondent, Ms. Harker and Ms. Vogel met with Mr. McCollom on June 7, 2021 to discuss changes to Ms. Harker's estate planning.[52] To understand Ms. Harker's independent wishes, Mr. McCollom asked Ms. Vogel to leave the room.[53]

---

[49] The M&T joint bank account was originally set up by Mr. Harker, but after he passed the account was owned by Ms. Harker and the Petitioner. Petitioner Tr. 204:4–10, 205:6–11; *see, e.g.*, JX66 at GRIMES17, 35, 45, 60, 65, 70, 75, 80, 95, 109, 122, 132, 137.

[50] McCollom Tr. 364:2–4; *see* JX1 at MDSU3.

[51] McCollom Tr. 363:13–365:1, 372:4–7.

[52] Respondent Tr. 770:3–5; JX1 at MDSU8.

[53] McCollom Tr. 368:10–14.

11

While alone with Ms. Harker, Mr. McCollom learned that Ms. Harker felt she was being neglected and ignored by the Petitioner.[54] Per Mr. McCollom, Ms. Harker appeared emotional but she was determined to remove the Petitioner from her estate documents.[55]

Mr. McCollom helped Ms. Harker do just that. On the same day as the initial meeting, Mr. McCollom drafted new estate planning documents including a revocable trust (the "Trust"), advanced health care directive (the "AHCD"), a power of attorney (the "First POA"), and a will (the "Will" and collectively the "June Documents").[56] Mr. McCollom testified that he typically goes through a multi-step process of discussions regarding documents and multiple meetings, though under these circumstances Mr. McCollom thought it "best to accelerate things."[57]

Mr. McCollom personally went over the June Documents with Ms. Harker.[58] As he explained, the Will was a pour-over will which provided that the residue of Ms. Harker's estate would be transferred into the Trust.[59] The Trust provided for

---

[54] *Id.* at 368:23–369:2.

[55] *Id.* at 368:23–370:3.

[56] Tr. 371:5–7; Pretrial Order at p. 7 ¶ 27; *see* JX1 at MDSU123, 130, 142, 160.

[57] McCollom Tr. 373:11–15; *see id.* at 370:24–371:4 ("Again, my concern was her well–being, and again, she seemed she was upset. I didn't—my concern was that if there was a bad situation, we certainly didn't want to see it escalate into something worse.").

[58] *Id.* at 378:11–15.

[59] JX1 at MDSU160.

distribution to the Respondent if he was living and if he was not living to his issue per stirpes, then to Stephen Harker, then to Patricia Harker.[60] Through the ACHD, if Ms. Harker was found unable to make her health care decisions, the Respondent would be appointed as her agent.[61] Lastly, the First POA was a springing power of attorney that gave the Respondent authority to act as Ms. Harker's agent upon a later determination that Ms. Harker did not have the ability to manage her affairs.[62] Ultimately, Ms. Harker executed the June Documents in Mr. McCollom's office.[63]

Ms. Harker went on to make additional changes to her final wishes. Before I address those, however, I must turn to a major point of contention—Ms. Harker's health as she went about ordering her final affairs.

### C. Ms. Harker's Decline

There is no dispute that Ms. Harker's health began to decline in her final years. The earliest indications of that decline, at least in the record before me, are from 2014. In 2014, Ms. Harker slipped on ice while retrieving her mail and broke her hip.[64] She had to undergo surgery, rehabilitation, and, thereafter, used a walker for

---

[60] *Id.* at MDSU145.

[61] *Id.* at MDSU123.

[62] McCollom Tr. 379:1–9; JX1 at MDSU130.

[63] McCollom Tr. 372:16–376:5.

[64] Petitioner Tr. 197:8–18.

mobility.[65] After Ms. Harker's hospitalization and rehabilitation, she returned to live at the Property, where she utilized a stair chair to reach her second floor.[66] Although Ms. Harker remained independent, the Petitioner began to spend more time with her, checking up with lunch or shopping visits about once a week.[67]

Then, in 2019, Ms. Harker fell again, this time breaking her left hip and wrist.[68] This second fall proved to be more damaging than the first. Ms. Harker was admitted to Christiana Care Hospital in Wilmington from October 2, 2019 through October 18, 2019, during which she received treatment and rehabilitation.[69]

The fall reduced Ms. Harker's mobility, and she was no longer able to live independently at the Property.[70] Thus, shortly after her discharge, Ms. Harker moved in with the Petitioner at the Petitioner's primary home in Warwick, Maryland.[71] But Ms. Harker needed more than the Petitioner could provide and, on October 23, 2019,

---

[65] Pretrial Order at p. 6 ¶ 20.

[66] *See* Petitioner Tr. 197:15–18.

[67] *Id.* at 197:19–198:10.

[68] Pretrial Order at p. 6 ¶ 21.

[69] *Id.* at p. 6 ¶ 22; Petitioner Tr. 198:11–15.

[70] *See* Petitioner Tr. 200:6–20. Because the Property has a two–story home with the bedrooms and shower on the second floor, the doctors and social workers advised Ms. Harker and the Petitioner that Ms. Harker should not return to the Property. *Id.* at 198:15–18.

[71] Pretrial Order at pp. 6–7 ¶ 24; Petitioner Tr. 198:15–24.

Ms. Harker moved into Cadia Broadmeadow, an inpatient rehab facility in Middletown, Delaware, where she stayed until December 11, 2019.[72]

While Ms. Harker was at Cadia, per Cadia's records, Ms. Harker evinced signs of "cognitive loss/dementia."[73] Further, the records reflect that "Ms. Harker has an alteration in decision making ability r/t impaired cognitive patterns secondary to cognitive loss."[74] These notes indicated a "problem start date" of November 5, 2019, and contained a "long term goal target date" of February 5, 2020, at which point it was intended that Ms. Harker would "be able to recognize direct caregivers and family[.]"[75] There is no record, however, of when or by whom Ms. Harker was diagnosed with dementia, nor what the severity of such condition was upon diagnosis, if any.

Upon Ms. Harker's discharge on December 11, 2019, she returned to the Petitioner's home in Warwick.[76] At the Petitioner's home, Ms. Harker had two bedrooms—one for her bed and another for her clothes and personal items.[77] The

---

[72] JX4; Romirowsky Tr. 21:6–12; Petitioner Tr. 201:4–7.

[73] JX3 at Cadia4 (capitalization altered).

[74] *Id.* Approaches were outlined to combat the "cognitive loss/dementia" diagnosis such as allowing processing time for Ms. Harker, ensuring access to a clock or calendar, explaining an activity before beginning it, providing verbal cues, and re-orienting her to the date, time and environment as needed. *Id.*

[75] *Id.*

[76] Petitioner Tr. 201:11–18.

[77] *Id.* at 206:12–22.

Petitioner also installed a pull-down shower and a shower bench, and purchased a hospital bed for Ms. Harker, to make her more comfortable.[78]

This set up seemed to work well for Ms. Harker, who settled into a consistent routine.[79] But, as is often the case with family caregivers, the accommodations and care required took a toll on the Petitioner. The Petitioner's life changed more than she had expected.[80] The Petitioner fixed dinner every night, bought Ensure, and made pancakes and eggs at least once a week for Ms. Harker.[81] The Petitioner and Ms. Harker also did not enjoy the same television shows, and Ms. Harker put on closed captioning due to her difficulty hearing which drove the Petitioner "nuts."[82] Ms. Harker would also tell the Petitioner to vacuum and would follow her around in her wheelchair picking up the lint on the floor to chastise the Petitioner's cleanliness.[83] In addition to the growing pains of their new living situation, the Petitioner testified that she observed and had to grapple with Ms. Harker's increasing forgetfulness.[84]

---

[78] *Id.* at 201:16–18.

[79] *See, e.g.*, Respondent Tr. 762:4–763:1.

[80] *See* Petitioner Tr. 230:20–21 ("And then, you know, after she came, it was—it was all this stuff.").

[81] *Id.* at 230:21–231:4.

[82] *Id.* at 231:12–16.

[83] *Id.* at 232:20–233:4.

[84] *Id.* at 221:2–18 ("And she would—sometimes you could have a regular conversation with her, and sometimes she would say things like, watching TV, 'There's Joe Biden. He's

## D. The Petitioner's Medical Scare

The mother-daughter worked through their differences as best they could. But then the unexpected happened: in May of 2021, Ms. Harker woke up to find the Petitioner unconscious on the floor. [85] Ms. Harker called 911 and then the Respondent.[86] The Petitioner was taken to the hospital, where she was treated for a kidney stone that turned into an infection that went septic; she was hospitalized for six days.[87]

With the Petitioner ill, Ms. Harker looked to the Respondent and Ms. Vogel for support. The Petitioner's medical emergency brought the couple back together, and they moved into the Petitioner's house to help Ms. Harker.[88] Per the Respondent, the Petitioner's house was in disarray when the Respondent arrived, something out of character for the Petitioner.[89] He tried to clean things up and provide the support Ms. Harker needed in the Petitioner's absence.

---

from my hometown, Summersville, West Virginia. He lives there.' And I would say, 'Mom, don't you mean Wilmington? Remember, he was our Senator in Delaware for a long time. Don't you mean Wilmington?' 'No, he's from Summersville, West Virginia.' One night when I had lasagna for dinner, she asked me, 'What is this I'm eating?' 'Lasagna.' Stuff like that that would, you know—it would just be off and not like she used to be.").

[85] *Id.* at 223:22–224:1.

[86] *Id.* at 224:2–3.

[87] *Id.* at 224:3–13.

[88] *Id.* at 226:5–13.

[89] Respondent Tr. 755:11–756:24.

When the Petitioner returned home, however, things had changed. Although the Petitioner and the Respondent cast their blame in different directions, they both agree that the relationship between the Petitioner and Ms. Harker appeared strained immediately after the Petitioner's discharge and reentry into the home. It was the Respondent who picked the Petitioner up from the hospital and brought her back to the house.[90] Her reunion with Ms. Harker was tense. But, even more unfortunately, the same day the Petitioner came home from the hospital, the Petitioner suffered another fall.[91] The Petitioner was then re-admitted and hospitalized for another six days.[92]

This second admission provided more time for the estrangement between the Petitioner and Ms. Harker to grow. Again, the Respondent and the Petitioner disagree regarding how and why that estrangement grew. Per the Respondent, it was all Ms. Harker. The Respondent testified that Ms. Harker repeatedly asked the Respondent if she could move back into the Property with him and Ms. Vogel due to her dismay living with the Petitioner.[93] Per the Petitioner, it was the couple who poisoned Ms. Harker against the Petitioner and set everything in motion. Blame aside, Ms. Harker eventually made her way home.

---

[90] *Id.* at 757:11–15.

[91] Petitioner Tr. 224:14–225:2.

[92] *Id.* at 224:13.

[93] Respondent Tr. 765:20–23.

### E.  Ms. Harker's Return Home

Per the Respondent, Ms. Harker pushed to return to the Property, her home, with the couple. But the Respondent testified that he expressed apprehension towards Ms. Harker's idea because he thought the Petitioner would "annihilate [his] entire life."[94] The Respondent recommended that they talk to Ms. Harker's attorney, Mr. McCollom, before taking any concrete steps.[95] Per the Respondent, Ms. Harker gave him Mr. McCollom's contact card, and the Respondent gave him a call.[96]

The Respondent's message was not, however, solely about a potential move. Mr. McCollom's assistant received a call from the Respondent purporting to relay Ms. Harker's desire to make changes to her estate planning documents. That desire, per the Respondent's message, was spurred by apparent abuse allegations against the Petitioner, ringing alarm bells which pointed to an "urgent" situation.[97] That call led to the execution of the June Documents addressed above.

Per Mr. McCollom, Ms. Harker appeared emotional while they discussed the change to her estate, but she was determined to resolve her unsatisfactory living situation by moving out and removing the Petitioner from her estate documents.[98]

---

[94] *Id.* at 766:5.

[95] *Id.* at 767:1–6.

[96] *Id.* at 768:9–16.

[97] McCollom Tr. 368:16–19, 393:4–11, 395:4–7.

[98] *Id.* at 368:23–370:3.

Mr. McCollom did not notice any evidence of cognitive decline during his June 7 meeting with Ms. Harker.[99] Mr. McCollom also expressed no concern that Ms. Harker lacked capacity because in his experience evidence of incapacity "becomes pretty apparent pretty quickly."[100] Thus, he witnessed Ms. Harker execute the June Documents, confident she was acting knowingly and of her own free will.

Then the escape plan was hatched.[101] Ms. Harker and the couple stayed until the Petitioner's second return from the hospital. But, per the Petitioner, the trio was quiet and cold toward her. Eventually, the Petitioner woke up one morning to an empty house.[102] Neither her mother, son, nor daughter in law gave the Petitioner any prior warning that they would be leaving.[103] And all they left behind was a note from Ms. Vogel accusing the Petitioner of theft, animal abuse, and taking advantage of

---

[99] *Id.* at 370:7–10.

[100] *Id.* at 377:8–11.

[101] Per the Respondent, there was an additional reason for Ms. Harker's urge to escape and cut off the Petitioner—a line of credit. The Respondent testified that, around the time of Ms. Harker's meeting with Mr. McCollom, the Respondent and Ms. Harker saw a bank statement that arrived in the mail referring to a line of credit on the Property. Respondent Tr. 829:22–830:15, 834:2–19; 851:5–22. The "discovery" of the line of credit, per the Respondent, set off red flags for both Ms. Harker and the Respondent. *See id.* at 830:9–22. The Respondent testified that Ms. Harker was confused and was adamant that she did not remember taking out the line of credit. The Respondent also found the line of credit to be "weird," and speculated that the Petitioner filled out the paperwork while Ms. Harker signed it. *Id.* at 833:14–24. At trial, any concerns about the line of credit were alleviated. *See* JX5–6, Petitioner Tr. 217:6–12; JX73 at BHARKER492; Petitioner Tr. 221:22–222:11; JX73 at BHARKER458, 489.

[102] Petitioner Tr. 228:20–21.

[103] *Id.* at 228:24–229:4.

Ms. Harker.[104] The Respondent followed suit with ill-tempered text messages accusing the Petitioner of being a thief and a narcissistic sociopath.[105] And, in perhaps the most crushing blow, the Petitioner never saw her mother again.[106]

After leaving the Petitioner's house, the Respondent took Ms. Vogel and Ms. Harker to a hotel in Pennsylvania for the weekend.[107] Meanwhile at the Property, the Respondent and Ms. Vogel's brother helped to move Ms. Harker's bedroom furniture downstairs to replicate the set-up of her upstairs bedroom.[108] Once ready, the trio then moved back in.

After Ms. Harker moved back into the Property, it became difficult for her friends to contact and visit with her.[109] Bill Laughlin, Ms. Harker's mentee, testified about his experience when he went to visit Ms. Harker at the Property.[110] During one visit, Mr. Laughlin knocked on the door of the Property to no avail. But, upon hearing Ms. Harker's voice inside, he decided to wait for five to seven minutes.[111]

---

[104] *See id.* at 234:13–18.

[105] *Id.* at 229:6–13; Respondent Tr. 860:8–861:7.

[106] Petitioner Tr. 237:10–11.

[107] Respondent Tr. 773:23–775:2.

[108] *Id.*

[109] Four friends of Ms. Harker testified: William McLaughlin, Frank Livoy, Stephen Jackson, and James Hess.

[110] Laughlin Tr. 427:22–428:3.

[111] *Id.* at 431:19–432:3.

During his wait, Mr. Laughlin noticed there was no longer a storm door at the entryway to the Property because it had been shattered, and only shards of glass remained.[112]

Eventually Ms. Vogel arrived in "her" BMW, addressed below, and Mr. Laughlin proceeded to introduce himself.[113] Ms. Vogel responded that she needed to call the Respondent first.[114] After Ms. Vogel called the Respondent for approval and apparently received it, Mr. Laughlin was able to talk to Ms. Harker in the kitchen, with the Respondent monitoring, listening, commenting on what was being said, and reconnoitering the area.[115] Ms. Harker relayed to Mr. Laughlin that she needed a doctor, and that she wanted to take a bath and move out.[116]

In addition to the Respondent's controlling behavior, Mr. Laughlin made several other observations that concerned him. There were dishes piled up in the sink and plates of uneaten and half-eaten food around the house.[117] In the living room, clothing and pillows were piled and magazines were strewn across the floor.[118] The

---

[112] *Id.* at 433:5–10.

[113] *Id.* at 432:9–12.

[114] *Id.* at 432:12–13. In all fairness, Ms. Vogel and Mr. Laughlin did not know one another at that time. *Id.* at 432:13–14.

[115] *Id.* at 435:21–24.

[116] *Id.* at 439:5–8.

[117] *Id.* at 434:23–435:2.

[118] *Id.* at 434:4–17.

stairs were cluttered with shoes and laundry.[119] Ms. Harker's personal appearance was also askew. Per Mr. Laughlin, Ms. Harker took great pride in her hair, which always looked "perfect," but, during his visit, it looked like an "oil slick . . . running down her head as if her hair hadn't been washed in how many weeks."[120] Based on her appearance and demeanor, he testified: "This was not the same person that I knew."[121] Mr. Laughlin left dismayed and, despite repeated attempts, never saw Ms. Harker again.[122]

## F.     The Financial Transactions

In connection with the move, the Respondent also assisted Ms. Harker with several questionable financial transactions. Although the Respondent testified he was apprehensive of the idea, in or around May/June 2021, he wrote several checks for Ms. Harker to himself in amounts nearing $3,000 and $5,000, to pay off his credit card bills.[123] Also, on June 7, 2021, the Respondent drove Ms. Harker to the bank to

---

[119] *Id.* at 453:21–454:2.

[120] *Id.* at 440:21–441:1.

[121] *Id.* at 437:23–438:1.

[122] *Id.* at 439:9–15. During another visit with Ms. Harker's friend and neighbor, Frank Livoy, Mr. Livoy noticed that Ms. Harker would repeat the same story three times within a half hour, and that he needed to repeat himself multiple times. Livoy Tr. 453:13–19.

[123] Respondent Tr. 884:5–18; JX37.

liquidate the joint M&T bank account held by Ms. Harker and the Petitioner, for which Ms. Harker received a check for $38,702.27.[124]

Then, shortly after moving out of the Petitioner's house, the Edward Jones Account came into play. Sometime in mid-2021, Ms. Harker called Mr. Lucas requesting the Petitioner be removed from the Edward Jones Account.[125] Mr. Lucas was surprised and indicated he would need to investigate the request and get back to Ms. Harker, if it was possible, and if so, how it would be accomplished.[126] Thereafter, Mr. Lucas called Ms. Harker back and explained that to make the joint account a single account, both Ms. Harker and the Petitioner needed to sign paperwork authorizing the transfer.[127] During the call, Ms. Vogel introduced herself and explained that the Respondent was in the process of getting a power of attorney.[128] Several weeks later, Mr. Lucas received the First POA.[129] Acknowledging its springing nature, Mr. Lucas told the Respondent that he would

---

[124] Respondent Tr. 866:24–868:4; *see* JX27–28.

[125] Lucas Tr. 159:3–11. Mr. Lucas believes Ms. Harker called him sometime in May, but, assuming Mr. Lucas was able to get back to Ms. Harker a "couple of days later" as he suggests, that initial call may have actually been made closer to July. *See id.* at 162:2–6; JX75.

[126] Lucas Tr. 161:15–162:1.

[127] *Id.* at 162:2–10; JX75.

[128] Lucas Tr. 162:13–163:6.

[129] *Id.* at 163:7–13; *see* JX45 at GRIMES596.

need a letter from a doctor indicating Ms. Harker was incapacitated before the Respondent could take action on the Edward Jones Account.[130]

Mr. McCollom was also involved in the Respondent's efforts to access, or assist Ms. Harker with accessing, the Edward Jones Account. On June 14, 2021, Mr. McCollom spoke with Mr. Lucas over the phone, expressing his dismay and insisting that Ms. Harker should have access to the account and should be able to unilaterally turn the Edward Jones Account into a single account.[131] In response, Mr. Lucas informed Mr. McCollom that Ms. Harker could request checks to draw from the account, which she promptly requested.[132]

Thereafter, on June 15, 2021, Ms. Harker executed a second power of attorney (the "Second POA"), which was drafted by Mr. McCollom to take effect immediately.[133] Mr. McCollom expressed no concern regarding Ms. Harker's capacity when signing the Second POA.[134] With the Second POA, the Respondent was able to get online access to the Edward Jones Account.[135] The Respondent

---

[130] Lucas Tr. 165:7–13.

[131] *Id.* at 177:11–23. Mr. McCollom testified he did not remember talking to Mr. Lucas about the Edward Jones Account, but the conversation is referenced on his bills. *Id.*; *see* JX1 at MDSU8 (noting a telephone conference with a broker).

[132] *See* Respondent Tr. 868:24–869:13.

[133] JX1 at MDSU175; *see id.* at MDSU173.

[134] McCollom Tr. 383:20–22.

[135] *See* JX20 (showing the online access capabilities to the Edward Jones Account); JX21 at 16.

immediately directed Mr. Lucas to withdraw $2 million.[136] Mr. Lucas discussed the request with Ms. Harker, explaining there were significant capital gains tax consequences to the request.[137] Ms. Harker insisted on selling, but agreed to withdraw a reduced amount of $400,000.[138]

Mr. Lucas then contacted the Petitioner and informed her of Ms. Harker's withdrawal.[139] In response, the Petitioner directed a sale and liquidation of her own: for $500,000 to be distributed to her to ensure she was not left with nothing.[140]

Ultimately, between July 13, 2021, and July 16, 2021, Mr. Lucas authorized trades liquidating the entirety of the Edward Jones Account.[141] But the bank did not permit any additional withdrawals and, rather, as confirmed in a July 20, 2021 letter, modified the account to prohibit any further actions without the agreement of both co-owners.[142]

---

[136] Lucas Tr. 167:9–10. Before the Respondent's access to the Edward Jones Account, the largest single withdrawal from the account was a withdrawal of $40,000. *Id.* at 166:23–167:2.

[137] *Id.* at 167:15–22.

[138] Respondent Tr. 789:5–12. The liquidation of the stock ultimately resulted in $413,200.00. *See* JX30.

[139] Lucas Tr. 168:14–19.

[140] *Id.* at 168:18–169:1.

[141] Pretrial Order at p. 5 ¶ 15.

[142] This is known as the "divorcing clients" policy at Edward Jones. Lucas Tr. 169:11–170:5; *see* JX23.

The questionable financial transactions do not end there. The same day the Second POA was executed, Ms. Harker's money was used to purchase a BMW, which was titled in Ms. Vogel's name.[143] Her money was also used to purchase a new Tesla, which was titled in the Respondent's sole name.[144] Ms. Harker was present with Ms. Vogel and the Respondent when the cars were purchased.[145] Per the Respondent, the purchases were completely appropriate because Ms. Harker never placed restrictions on his use of her money.[146] Ms. Harker's mantra, per the Respondent, was "Get this, do this."[147]

By others, Ms. Harker was described as someone who "would not want money to be spent carelessly" and was a frugal spender herself.[148] Nevertheless, the Respondent testified that Ms. Harker encouraged him to use her money to get a new wardrobe because he "should look like a million-dollar man."[149] And he followed "orders," splurging, for example, on extravagant name-brand clothing for himself and Ms. Vogel. Bank statements show that Ms. Harker's money, in the amount of roughly sixty-thousand dollars, was spent at places like Victoria's Secret, tattoo

---

[143] JX44; Respondent Tr. 794:4–11; *see* JX29, JX70.

[144] Respondent Tr. 798:16–800:7.

[145] *Id.* at 799:12–15; JX70.

[146] Respondent Tr. 801:5–14.

[147] *Id.* at 801:14.

[148] Hess Tr. 493:4–8.

[149] Respondent Tr. 803:20–804:5.

parlors, smoke shops, Amazon, and numerous luxury fashion stores including Dolce & Gabbana, Jimmy Choo, FashionPhile, Christian Louboutin, and Saks 5th Avenue.[150] These purchases were for the Respondent and Ms. Vogel's benefit.[151] But, again, per the Respondent, Ms. Harker was happy to provide for both he and Ms. Vogel in that manner.

The final financial transaction of note occurred on July 8, 2021. At that time, the Respondent and Ms. Harker went to PNC to liquidate the rest of Ms. Harker's personal account and were given a cashier's check for approximately $360,000.[152] That money, according to the Respondent, was deposited with Bank of America.[153]

## G. The APS Investigations

As things escalated, the Respondent made a referral to Adult Protective Services ("APS") alleging that Ms. Harker was being abused by the Petitioner, including financial exploitation, caregiver neglect, and psychological and verbal

---

[150] *See, e.g.*, Respondent TT 9:4–14:23; *see* JX80–81.

[151] *See, e.g.*, Respondent TT 9:23–24.

[152] Respondent Tr. 827:18–23; JX35. Sometime around the liquidation of the Edward Jones Account, the Petitioner texted the Respondent that "It is a joint account WITH RIGHT OF SURVIVORSHIP. And as far as signature, that is wrong. I have equal rights to it, which she always agreed with until all this happened. I can make a phone call and have money moved, I have done it many times. I can show you the account statements. Don't play yourself, if I see she is taking a lot of money out, I will cash out all the investments, which will leave you with not much. She has always urged me to use that money. Her new roof, my new roof, our living expenses, your new couch, moving you 3 times, etc. A man keeps his word. You haven't." JX64.

[153] Respondent Tr. 827:24–828:3, 894:10–15.

abuse.[154] APS acted quickly and, following an attempted visit on July 20, 2021, on July 21, 2021, a social worker visited the Property to investigate.[155] The social worker noted the house seemed a "little hoarded" and needed "cleaning."[156] During a private discussion, Ms. Harker told the social worker that "[she] was living with [her] daughter and it was not working out. She was nasty. [Her] daughter was very abusive to [her]. [She] got out as soon as [she] [could]."[157] Ultimately, Ms. Harker signed the APS refusal of investigation and services form and stated that she was "not being financially exploited by Mr. Kwanza Grimes and Mrs. Ashley Vogel."[158]

On November 2, 2021, a second APS report was made by PNC Bank, related to several charges made on Ms. Harker's bank account.[159] APS contacted the Petitioner about the allegations.[160] The Petitioner informed the APS worker that she

---

[154] JX59.

[155] *Id.*; Respondent Tr. 820:12–22. According to the APS records, the "alleged victim's grandson," *i.e.*, the Respondent, had called APS "for resources[.]" JX59 at 2.

[156] JX59 at 5.

[157] *Id.* at 6.

[158] *Id.* at 9. The APS records reflect that the investigation into the Petitioner, the original alleged perpetrator, was completed and the allegations "substantiated," but the parties introduced an affidavit from Linda Bazemore, an Investigator's Supervisor for APS, attesting that the "substantiated" determinations were entered in error. *Id.* at 19. She explained: "there was no determination of any allegations and findings against [the Petitioner], despite what may be referenced in the APS Records." *Id.*

[159] *Id.* at 11, 14. The Petitioner is adamant she did not instigate the bank's report. Petitioner Tr. 502:8–24.

[160] JX59 at 11.

used to be Ms. Harker's power of attorney, but that the Respondent was then the current power of attorney.[161] The APS worker noted that the Petitioner reported that Ms. Harker "treats [the Respondent] like he is her baby and thinks that he can do no wrong[,]" and therefore Ms. Harker "will never say that [the Respondent] is stealing money from her because he [is not]. She allows him to make the purchases."[162] The APS reports reflect that, as of March 14, 2022, they had still been unable to contact Ms. Harker about the bank's report and, it appears, APS did not take any further action before Ms. Harker passed on June 14, 2022.[163]

## H.  The Final Plan

By mid-2021, the parties' disputes had escalated such that litigation was inevitable. But the Respondent and Ms. Harker made one more attempt to address Ms. Harker's estate planning before the Petitioner initiated this action. Seeing the growing divide between his former co-worker (the Petitioner) and client (Ms. Harker), Mr. McCollom conflicted out.[164] The Respondent then asked Delaware estate planning attorney, Dan Crossland, Esquire, to step in.[165] In late June 2021, Mr.

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *See* McCollom Tr. 385:19–387:11. On January 28, 2022, the Petitioner emailed Mr. McCollom, expressing her dismay over the execution of the June Documents. *Id.* at 385:19–24; JX1 at MDSU6.

[165] *See* Crossland Tr. 553:14–556:20; JX2 at MACELREE227.

Crossland met with Ms. Harker to review the documents drafted by Mr. McCollom, and discussed funding the Trust.[166] Mr. Crossland's notes reflect a discussion about the Petitioner being "nasty/abusive[,]" but that the root of the problem "turned out" to be issues with Ms. Harker's hearing aids.[167] Mr. Crossland was further told that money was "in limbo" and that the "daughter took [a] loan out." [168] Further, Crossland's notes indicated a possible challenge by the Petitioner as a result of the deed and codicil drafted by Mr. McCollom.[169]

As to her wishes, Ms. Harker explained that she intentionally excluded her son in her estate plan due to their an estranged relationship.[170] More importantly, Ms. Harker explained she chose to exclude the Petitioner because she was "verbally abusive," and that "if she had to go back to live with her daughter, she would kill herself."[171] Mr. Crossland did not observe anything that would make him question Ms. Harker's capacity, nor did he see evidence of undue influence based on his professional experience.[172]

---

[166] Tr. 556:21–558:19; JX2 at MACELREE102, 119.

[167] JX2 at MACELREE119.

[168] *Id.*

[169] *Id.*

[170] Crossland Tr. 560:23–561:3.

[171] *Id.* at 562:18–23.

[172] *Id.* at 565:16–567:8.

Mr. Crossland and his team, thus, began drafting revisions to Ms. Harker's estate plan. Those revisions were not finalized by August 31, 2021, though, by the time the Petitioner initiated this action.[173] With the Petitioner's filing, any estate planning efforts were put on hold and, based on the allegations in the Petitioner's petition, Mr. Crossland requested Ms. Harker's capacity be evaluated.[174]

To that end, on October 14, 2021, Ms. Harker had a virtual appointment with Dr. Lynsey Brandt of Geriatric Care Swank Memory Center, the results of which were "quite good[.]"[175] Then, on December 28, 2021, psychiatrist Dr. Neil S. Kaye conducted a forensic psychiatric evaluation, including an in-office assessment through which Ms. Harker scored a 29/30 on a mini mental status examination.[176] Dr. Kaye provided a caveat to the score, however, explaining that the capacity assessment was "limited only to [Ms. Harker's] understanding of her medical and basic financial decisions," and that it "would not encompass testamentary capacity."[177] As part of his evaluation of Ms. Harker, Dr. Kaye reviewed her estate planning documents, various filings in this action, the Christiana Care records, and

---

[173] *Id.* at 563:13–22; *see generally* D.I. 1.

[174] Tr. 564:10–565:15.

[175] JX62.

[176] JX61 at 4.

[177] *Id.*

the Cadia records.[178] Ultimately, Dr. Kaye issued a report finding "no evidence that Ms. Harker [was] a susceptible individual."[179]

With this clearance, Ms. Harker moved forward with executing the estate planning documents prepared by Mr. Crossland.[180] On December 30, 2021, with witnesses in a conference room, Ms. Harker executed a new power of attorney (the "Third POA"), will (the "Second Will"), advanced health care directive (the "Second AHCD"), amended and restated trust, a deed transferring the Property to the Trust, and a Delaware Disposition of Last Remains (collectively, the "December Documents").[181]

The entire process of reviewing and signing the documents took about two hours.[182] During the review, Ms. Harker was engaged and asked questions relating

---

[178] Dr. Kaye Tr. 257:11–258:18; *see* JX61 at 6.

[179] JX61 at 7. The report also documented that Ms. Harker clearly articulated to Dr. Kaye her reason for being at his office, stating, "I'm seeing you because I need a professional opinion about my mental state about whether or not I can do legal things and estates that most 94-year old people can't do." *Id.* at 5. She told Dr. Kaye, "what my daughter says about me is wrong." *Id.* She was emphatic that she did not want to return to living with her daughter, stating, "I'd rather kill myself." *Id.*

[180] Crossland Tr. 568:8–13.

[181] *Id.* at 570:9–18; 654:11–23; JX2 at 69–78, 129–30, 131–35, 136–52, 172–76. Mr. Crossland appeared on Zoom and watched the execution of the documents due to a COVID exposure. Tr. 571:2–21. Ms. Harker pointed out changes that needed to be made on the date of execution—Ms. Vogel's last name was changed from Vogel to Grimes, and Ms. Harker explained that she wanted her body donated to Temple University Hospital via the Second AHCD. Sawyer Tr. 678:5–14.

[182] *Id.* at 675:4–5.

to the documents, such as the commodities and options section of the Third POA.[183]

She even asked when Mr. Crossland's associate would be sworn into the bar because

she was operating on a COVID-related limited license.[184] Mr. Crossland found Ms.

Harker to be "the most capable 90-something [he has] ever met."[185] Thus, he had no

concerns moving forward to finalize her final estate planning documents in the midst

of this litigation.

## II.    PROCEDURAL POSTURE

As noted, the Petitioner initiated this action on August 31, 2021.[186] The

Respondent and Ms. Vogel retained counsel shortly thereafter.[187] After the

Petitioner's December 3, 2021 amended petition, the Respondent and Ms. Vogel

promptly answered and counterclaimed.[188] Then, on January 3, 2022, Ms. Harker,

---

[183] *Id.* at 659:9–14, 675:2–10, 679:1–10.

[184] *Id.* at 649:8–19, 681:10–11. After the execution of the December Documents, Mr. Crossland's associate returned to her office and drafted a detailed memorandum, which noted that "[Ms. Harker] made all of the elections on her own[,]" and described her interactions with Ms. Harker over the course of the execution. JX2 at 238–39.

[185] Crossland Tr. 645:10–11. Notwithstanding the execution of the December Documents, Mr. Crossland was unaware that Ms. Vogel suffered a drug overdose at the Property while Ms. Harker was present, or that the Respondent was arrested for an altercation with Ms. Vogel at the Property. *Id.* at 630:24–631:12; *see* Respondent TT 28:4–22. After being apprised of this information at trial, Mr. Crossland acknowledged that, had this information been provided, he may have taken a different course of action, such as recommending different fiduciaries. Crossland Tr. 631:21–633:4.

[186] D.I. 1.

[187] *See* D.I. 5.

[188] D.I. 10–11.

through the same attorney representing the Respondent and Ms. Vogel, moved to intervene and dismiss.[189] In response, the Petitioner filed a motion seeking to disqualify opposing counsel.[190] On May 31, 2022, I issued a report denying the Petitioner's motion to disqualify, granting Ms. Harker's motions to intervene and dismiss, but staying the latter to provide the Petitioner leave to amend.[191] The parties did not file exceptions to my report, which was adopted by the Chancellor as an order of this Court on June 15, 2022.[192]

Unbeknownst to the Court, however, Ms. Harker had already passed. She died on June 14, 2022, at the age of 94, after presenting with signs of a stroke. Ms. Harker's passing changed the nature of this action. On June 24, 2022, the Petitioner clarified the needed shift through an amended petition, now seeking: (1) a caveat against the Second Will and Will, (2) an accounting of agent transactions under the Second POA and Third POA, and (3) recoupment of assets allegedly disposed due to undue influence, lack of capacity, or otherwise resulting in unjust enrichment.[193]

---

[189] D.I. 12.

[190] D.I. 18.

[191] D.I. 32 at 1.

[192] D.I. 33.

[193] D.I. 37.

On July 20, 2022, the Respondent and Ms. Vogel moved to dismiss the reworked petition.[194] While that motion was pending, on August 8, 2022, I learned the parties were engaging in mediation, and on August 11, 2022, I issued an order staying this case pending same.[195] Unfortunately, that initial stay was not in place for long. On September 26, 2022, the Petitioner filed a motion for a temporary restraining order (the "TRO"), with a motion expedite, arguing that assets of Ms. Harker's estate were being dissipated and were at risk of being destroyed absent a professional trustee and administrator for her estate.[196] On October 4, 2022, after briefing and argument, I denied the TRO.[197] No exceptions were filed, and on October 14, 2022, the parties requested, and I granted, a continued stay in favor of resumed mediation.[198] Ultimately, though, mediation proved unsuccessful.[199]

With failed mediation, the parties moved forward to brief the motion to dismiss the amended petition. The Respondent and Ms. Vogel also initiated a new action, on December 12, 2022, seeking the return of estate assets from the Petitioner, which I consolidated with and into this action.[200] On May 4, 2023, after briefing, I

---

[194] Pretrial Order at p. 3 ¶ 12; D.I. 41.

[195] D.I. 44-45.

[196] Pretrial Order at p. 4 ¶ 13; D.I. 46.

[197] Pretrial Order at p. 4 ¶ 14; D.I. 55.

[198] D.I. 58–59.

[199] D.I. 60–62.

[200] Pretrial Order at p. 4 ¶ 15.

denied the motion to dismiss.[201] The pleadings closed shortly thereafter, and we were off to the races.

This report does not address the ins and outs of discovery or the minor skirmishes that arose; interested readers should consult the docket. Most notably, it was during the discovery phase that Ms. Vogel's participation ended. She did not appear for her noticed deposition, stopped engaging with counsel and the Respondent, and earned herself a default order declaring that: (1) any allegations directed to Ms. Vogel within the amended petition were deemed admitted, (2) any denials to those allegations were stricken and deemed admitted, (3) all affirmative defenses of Ms. Vogel were waived, and (4) any objection within her interrogatory responses were overruled.[202]

This matter was ultimately tried on May 8, 9, 10, and 20, 2024.[203] Among the fourteen witnesses, each side proffered expert testimony. For the Petitioner, it was Dr. Samuel Romirowsky, who testified that Ms. Harker's medical records referenced both physical limitations, as well as cognitive issues such as memory loss.[204] Dr. Romirowsky opined that Ms. Harker was susceptible and raised concerns about the

---

[201] Pretrial Order at p. 4 ¶ 16.

[202] D.I. 137.

[203] D.I. 138–40.

[204] Romirowsky Tr. 21:15–19.

influence of the Respondent and Ms. Vogel.[205] Dr. Romirowsky highlighted that Ms. Harker's suffered from cognitive loss and dementia, at least since November 2019 while at Cadia, which are progressive conditions, worsening over time, affecting her ability to make sound decisions.[206] He noted that medical records also indicated Ms. Harker was at risk for immobility, cognitive loss, and incontinence, further demonstrating her vulnerability.[207] He noted that the Respondent was present during Ms. Harker's medical evaluations and frequently answered questions on Ms. Harker's behalf, rather than Ms. Harker responding herself, suggesting to him a level of control over Ms. Harker's decisions that could have compromised her independence.[208]

The Respondent's expert, Dr. Kaye, disagreed.[209] Meeting Ms. Harker in person, he was impressed by her "high level of mentation," particularly regarding a

---

[205] *Id.* at 51:5–6; JX46.

[206] *Id.* at 22:14–23:2; JX3 at Cadia4; *id.* at Cadia258 (noting that Ms. Harker was at risk for immobility, cognitive loss, and incontinence); JX4 at ChristianaCare6 (noting that Ms. Harker suffered from cognitive changes and impaired hearing); JX4 at ChristianaCare108.

[207] *See* JX4 at CristianaCare113; JX3 at Cadia36.

[208] Romirowsky Tr. 16:4–17:7.

[209] The Petitioner argues that Dr. Kaye's testimony exceeded the scope of his expert report and thus should be stricken from the record and disregarded. *See* D.I. 152 at 64–67; Tr. 261:22–268:11. I do not rely on the challenged portion of Dr. Kaye's testimony for purposes of this decision, and thus the objections are moot. I otherwise give his testimony the weight and credibility I think it deserves.

bird feeder outside of his office.[210] Ms. Harker's ability to identify birds at the bird feeder was deemed "remarkable" and, "when you have a 94-and-a-half-year-old who does something like that, you remember it."[211] In addition to identifying aspects of the present, Ms. Harker was able to recall the past. For example, she was able to give Dr. Kaye her social and family histories "without any difficulty."[212] Dr. Kaye ultimately opined that Ms. Harker had both testamentary and contractual capacity and could make decisions on her own accord.[213] Perhaps most critically, he did not feel Ms. Harker was subject to undue influence.[214]

After developing their records, the parties engaged in post-trial briefing, which was completed on September 18, 2024.[215] This is my post-trial report.

## III. ANALYSIS

In their pretrial stipulation, the parties identified nearly 40 issues of fact and law that remained to be litigated. But, in post-trial briefing, they tightened their focus. The following issues have been properly preserved and presented for my consideration: (1) the ownership, and Ms. Harker's estate's entitlement to, the

---

[210] Kaye Tr. 280:5–20.

[211] *Id.* at 280:16–20.

[212] *Id.* at 282:1–5.

[213] *Id.* at 284:13–18.

[214] *Id.* at 284:22–23.

[215] D.I. 162; *see* D.I. 152, 158.

Edward Jones Account, (2) the extent to which the Petitioner is responsible, and should be held liable for, a questioned line of credit, (3) whether Ms. Harker was unduly influenced to disinherit the Petitioner in the Will and Second Will and to withdraw funds from the Edward Jones Account, (4) whether Ms. Harker had capacity to execute the June and December Documents, (5) whether the Respondent breached his fiduciary duties as Ms. Harker's agent under the Second POA and Third POA, (6) whether the Respondent has been unjustly enriched to the Petitioner's detriment, and (7) whether the Petitioner's fees should be shifted to Ms. Harker's estate.

In short, I find: (1) the Edward Jones Account was a joint account, providing the Petitioner with the right of survivorship, (2) the Respondent failed to demonstrate that the Petitioner bears any responsibility or liability in connection with the line of credit, (3) the Petitioner failed to prove that Ms. Harker was unduly influenced, (4) the Petitioner failed to prove that Ms. Harker lacked testamentary capacity to execute the June and December Documents, (5) the Respondent breached his fiduciary duties and the improper transactions should be voided, with the funds returned to Ms. Harker's estate, (6) the Petitioner has failed to prove unjust enrichment, and (7) the Petitioner's attorneys' fees should be shifted to Ms. Harker's estate. I address why in turn.

40

**A.** **The Edward Jones Account was a joint account with right of survivorship.**

The Respondent argues that the Edward Jones Account was merely a convenience account for the benefit of Ms. Harker, which should pass through Ms. Harker's estate. I disagree.

Delaware law recognizes the distinction between a true joint tenancy and a mere convenience account. A convenience account is created by the true owner of the funds when she adds names of other persons on the account so that those persons can access the funds in the account if the owner is incapacitated and the funds are needed for her benefit.[216] By contrast, "[w]hen a true joint tenancy exists, one of the consequences of such an arrangement is that the ownership of the asset passes to the surviving joint tenants when one of them dies and does not pass through the estate of the one who died."[217] In Delaware, there is a rebuttable presumption that a joint bank account is owned as tenants in common unless the owners "makes [their] intentions explicit in the language used to create title to the property" that they intend to create a joint tenancy with right of survivorship.[218]

---

[216] *In re Barnes*, 1998 WL 326674, at *2 (Del. Ch. June 18, 1998).

[217] *Id.*

[218] *Speed v. Palmer*, 2000 WL 1800247, at *4 (Del. Ch. June 30, 2000) (explaining that a joint tenancy with right of survivorship "can only be created by clear and definite language not reasonably capable of any different construction") (citation and quotation marks omitted).

In determining whether an account is a joint account with a right survivorship or merely a convenience account, I look to *Walsh v. Bailey* for guidance.[219] "*Walsh* stands for the proposition that if the account opening documents are clear and unambiguous, parol evidence may not be admitted to show a different intent."[220] In *Walsh*, the Court excluded parol evidence, finding the existence of a joint account where the clear language "outlin[ed] the consequences upon the heirs, next of kin, legatees, assigns and personal representatives which will flow from that relationship between the parties."[221] By contrast, where the account opening documents are lacking any relevant language, they do not clearly and unambiguously create a joint account with right of survivorship.[222]

This case begins and ends with the text and plain meaning of the Edward Jones Account opening documents. That paperwork includes "clear and definite language" showing that Ms. Harker and the Petitioner intended to create a joint tenancy with

---

[219] 197 A.2d 331 (Del. 1964).

[220] *In re Dryden*, 2021 WL 4060193, at *3 (Del. Ch. June 22, 2021); *see Messersmith v. Del. Tr. Co.*, 215 A.2d 721, 723 (Del. 1965) (noting a preference for the form account opening documents to exclude survivor-owner provisions, requiring parties to explicitly request that such provisions be added if so intended).

[221] 197 A.2d at 333 (cleaned up).

[222] *Dryden*, 2021 WL 4060193, at *5.

right of survivorship, barring my consideration of any "parol evidence . . . to vary the terms of the instrument."[223] The relevant portion of the opening form provides:

> Joint owners must select one form of ownership. **If you have questions regarding which form of ownership is appropriate for you, please contact your attorney. Edward Jones will not, nor is any employee authorized to, advise you with this choice.**
> 1) ☒ Joint Tenancy WROS (Not available in LA)
> 2) ☐ Tenants in Common
> 3) ☐ Tenants by the Entireties
> 4) ☐ Community Property (Community Property States only)
> 5) ☐ Community Property WROS (CA, NV & AZ only)
> 6) ☐ Survivorship Marital Property (WI only)
> 7) ☐ Marital Property (WI only)
>
> All owners must execute this Account Authorization and Acknowledgement Form.[224]

The "**X**" indicates the option selected for the Edward Jones Account: "Joint Tenancy WROS." The Respondent contends this language is not clear and unambiguous because it does not spell out the words "With Right of Survivorship[,]" which the Respondent implicitly agrees is the only reasonable or fair interpretation of the initialization. [225] The Respondent's quibble with the use of initials over the undisputed phrase intended does not create ambiguity sufficient to open the door to

---

[223] *In re Gedling*, 2000 WL 567879, at *6 (Del. Ch. Feb. 29, 2000) (citing *Walsh*, 197 A.2d 331).

[224] JX9.

[225] D.I. 158 at 35.

parol evidence.[226] The Edward Jones Account was a joint account, the Petitioner had a clear right of survivorship, and as such, the account became the Petitioner's solely owned property upon Ms. Harker's death.

## B. The Petitioner did not execute or misappropriate from the line of credit.

The Respondent has "asserted a claim against [the Petitioner] related to the equity line and his belief that [the Petitioner] had taken it out or withdrawn on the line."[227] The Respondent failed, however, to adduce any evidence in support of his suspicions and the record, rather, reflects that Ms. Harker most likely took out the line of credit herself. On September 8, 2014, Ms. Harker opened and signed the line of credit paperwork in the presence of a notary and a witness.[228] Ms. Harker was also aware of the existence of the line of credit as evidenced by Ms. Harker's own handwritten notations of "equity" parallel to the line-of-credit payments from her

---

[226] *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1197 (Del. 1992) (giving weight to public policy considerations).

Even if it did, the parol evidence admitted at trial—Mr. Lucas's testimony and the additional Edward Jones statements—overwhelmingly support a finding that Ms. Harker and the Petitioner intended to create an account with a right of survivorship. *See, e.g.*, Tr. 137:16–141:15, Tr. 133:5–134:14; JX7, JX12–19. The only parol evidence arguably to the contrary is that the Petitioner did not historically make transactions within or from the Edward Jones Account without Ms. Harker's approval. I find this custom or practice insufficient to overcome all the indicia to show that the parties intended a right of survivorship.

[227] D.I. 158 at 37.

[228] JX6 at 13.

PNC account.[229] The Respondent has, thus, failed to prove any cognizable claim in connection with the line of credit.

> ### C. The Petitioner failed to prove that Ms. Harker was unduly influenced.

The Petitioner seeks to invalidate the various estate planning documents, arguing that Ms. Harker was unduly influenced to execute them. The Petitioner bears the burden of proving her undue influence claim by a preponderance of the evidence.[230] Specifically, the Petitioner needed to prove that, more likely than not, (1) Ms. Harker was susceptible at the time the challenged documents were executed, (2) the Respondent had the opportunity to exert influence over Ms. Harker, (3) the Respondent had a disposition to exert influence for an improper purpose, (4) the Respondent actually exerted such influence, and (5) the execution of the documents demonstrates the effect of that exerted undue influence.[231] The Petitioner fell short of proving Ms. Harker was, more likely than not, susceptible. Thus, the Petitioner's claim fails, and I decline to address the remaining elements.

---

[229] *See, e.g.*, JX73 at BHarker485, 492.

[230] *McGee v. Est. of Hopkins*, 2022 WL 17492353, at *5 (Del. Ch. Nov. 22, 2022).

[231] *McGee*, 2022 WL 17492353, at *8, *adopted sub nom. Mcgee v. Hopkins*, 2022 WL 17633575 (Del. Ch. Dec. 9, 2022). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citation and quotation marks omitted).

While there is "no precise definition or defining feature of susceptibility, . . . the analysis is informed by the subject's capacity[.]"[232] This fact-intensive inquiry includes determining "whether objective evidence indicates that the individual could comprehend, understand, and make decisions himself."[233] This Court has previously found an individual susceptible to undue influence where he had "a debilitating mental condition[,] . . . diminished capacity to take care of basic daily tasks, and [a] need to rely on the help of family members[.]"[234] By contrast, in *In re McElhinney*, the Court found an individual was not susceptible to undue influence when "her health had started to decline; she had moved into assisted living; and there was evidence of forgetfulness" but she was "able to make her own decisions" and "understood the nature of her estate."[235]

This case is akin to *McElhinney*. There is no dispute that Ms. Harker was elderly, had some level of decline in her faculties, and demonstrated forgetfulness. But the trial record overwhelming shows she still understood the nature of her estate and was able to make her own decisions. In so holding, I find the testimony of Ms. Harker's attorneys, who remained steadfast that Ms. Harker was clear about her testamentary wishes, most credible. Neither Mr. McCollom nor Mr. Crossland

[232] *In re Dougherty*, 2016 WL 4130812, at *10 (Del. Ch. July 22, 2016).

[233] *Ray v. Williams*, 2020 WL 1542028, at *30 (Del. Ch. Mar. 31, 2020).

[234] *In re Boyd*, 2003 WL 21003272, at *6 (Del. Ch. Apr. 24, 2003).

[235] *In re McElhinney*, 2007 WL 2896013, at *4 (Del. Ch. Oct. 1, 2007).

observed anything that would make them question Ms. Harker's capacity. The Petitioner's record—including an expert witness who never personally met Ms. Harker, medical records with unclear and unquantified references to decline, and the testimony of the Petitioner and other lay witnesses as to Ms. Harker's forgetfulness and change in appearance and demeanor—is insufficient to support a finding that Ms. Harker was susceptible.

### D. The Petitioner failed to prove that Ms. Harker lacked testamentary capacity.

The Petitioner also argues that Ms. Harker lacked testamentary capacity at the time she executed the June and December Documents. Testators are presumed to have capacity, and thus a party contesting capacity bears the burden of proving lack thereof by a preponderance of the evidence.[236] To have testamentary capacity, the testator must "be capable of exercising thought, reflection and judgment, and must know what he is doing and how he is disposing of his property. He must have sufficient memory and understanding to comprehend the nature and character of his act."[237] Only a "modest level" of competence must be present for an individual to

---

[236] *In re Langmeier*, 466 A.2d 386, 402 (Del. Ch. 1983).

[237] *Id.*

possess the capacity required to execute a will.[238] If a testator has capacity, it is irrelevant whether the Court agrees with the testator's plan.[239]

The Petitioner's primary argument for lack of capacity arises from her belief that Ms. Harker operated under a delusion, or delusions, regarding the Petitioner's conduct toward her. A delusion is "a false belief for which there is no reasonable foundation, a conception of the existence of something which does not exist, of which the mind of the person entertaining it cannot permanently be disabused."[240] In determining the capacity of a testator allegedly suffering from delusions, the Court must decide whether such delusions occurred through the making of the documents, that the testator was not capable of exercising reflection, judgment, and thought, and did not possess the requisite memory and understanding to understand the nature and character of his acts.[241] Even partial delusions, if they bear the crux of the testator's elected disposition of assets, suggest the testator does not, in fact, have the capacity to execute the challenged documents.[242]

---

[238] *In re Vietri*, 2022 WL 3925995, at *6 (Del. Ch. Aug. 31, 2022) (citation and quotation marks omitted).

[239] *In re Tigani*, 2016 WL 593169, at *20 (Del. Ch. Feb. 12, 2016).

[240] *Id.* (citation and quotation marks omitted).

[241] *Id.*

[242] *Id.*

This Court applies a two-part test to determine whether a testator lacked capacity due to delusions: (1) "[w]as the belief of the testator a mere false idea as distinguished from an insane delusion[,]" and (2) "[a]ssuming such a delusion, did the testator change the beneficiaries of the estate because of that belief?"[243] Of critical importance to my analysis, "[m]istake and prejudice . . . are not insane delusions."[244] Further, the mere fact that a testator "dislikes certain of the natural objects of his bounty does not establish an insane delusion; even if such dislike is groundless; and still less if such dislike is based upon some reason, although it may be an unjust one."[245]

I find the Petitioner has failed to overcome the presumption of capacity. The Petitioner was required, and failed, to demonstrate that Ms. Harker, more likely than not, did not understand "[her] assets, the objects of [her] bounty, and the purpose of" the June and December Documents at the time they were executed.[246] Such cannot be shown merely through testimony that Ms. Harker was diagnosed with "cognitive loss/dementia[;]" a condition which has varying levels of severity and may effect mental faculties to varying degrees.[247] Like in *In re Henry*, "the medical records

---

[243] *Id.* (cleaned up).

[244] *Id.* at *21.

[245] *Id.* at *22 (citation and quotation marks omitted).

[246] *Boyd*, 2003 WL 21003272, at *5 n.42.

[247] *See In re Kittila*, 2015 WL 688868, at *12 (Del. Ch. Feb. 18, 2015) (explaining "a diagnosis of dementia, including Alzheimer's dementia, is not conclusive of a person's

49

provided [here] do not, however, include a medical diagnosis of dementia nor any indication as to the severity of such condition, to the extent it existed."[248]

I am unconvinced that Ms. Harker's belief regarding the line of credit caused her to change the beneficiaries of her estate.[249] In Ms. Harker's interactions with Mr. McCollom and Mr. Crossland, she failed to mention the line of credit as a reason for disinheriting the Petitioner.[250] Instead, Ms. Harker outlined the emotional abuse she allegedly suffered at the hands of the Petitioner, a subjective, arguable, but not deluded matter.[251]

---

testamentary capacity"); *Boyd*, 2003 WL 21003272, at *4 (finding testamentary capacity even with a diagnoses of dementia when "the evidence shows that [when the will was executed, the testator] understood that he was disposing of his estate to the beneficiaries named in the [will]"); *see* JX3 at Cadia4.

[248] 2021 WL 5816818, at *3 (Del. Ch. Nov. 10, 2021); JX3 at Cadia4.

[249] *See Tigani*, 2016 WL 93169, at *20.

[250] The Petitioner's own testimony undermines her delusion argument. Petitioner Tr. 336:1–8 ("I never thought she was held captive. If she didn't want to go with them, she would not have gone with them. So I felt like, 'You're a grown woman. You can live wherever you want. But somebody could have told me. Somebody could have told me you guys felt this way. None of you told me. None of you even came into my bedroom down the hall and talked to me about any of that.'").

[251] *See* Livoy Tr. 456:16–21 ("[S]he claimed that [the Petitioner] had mistreated her and hollered at her. I wrote it off as a little bit of minor dementia because everyone had to holler at [Ms. Harker] because she didn't wear her hearing aids or their hearing aids were not functional."). Hearing issues aside, I cannot find Ms. Harker delusion in her stated dislike for how she was treated during the increasingly tense relationship with the Petitioner; it is plausible she had a change of heart and wished to bequeath her home and assets to the Respondent in recognition of the care and comfort he provided to her.

On this record, I find the Petitioner has failed to prove, by a preponderance of the evidence, that Ms. Harker did not possess the minimal capacity required to execute the June and December Documents.

**E. The Respondent breached his fiduciary duties as Ms. Harker's agent under the Second POA and Third POA.**

The Petitioner next argues the Respondent breached his fiduciary duties to Ms. Harker by engaging in several self-interested transactions as agent under the Second POA and Third POA.[252] A breach of fiduciary duty claim requires proof, by a preponderance of the evidence, of two elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[253] The Respondent implicitly concedes that he owed duties to Ms. Harker and takes issue solely with the second element—whether he breached those duties.[254] I find he did.

"The creation of a power of attorney imposes the fiduciary duty of loyalty on the attorney-in-fact."[255] But, although "[a]n attorney-in-fact, under the duty of loyalty, always has the obligation to act in the best interest of the principal" the principal can waive such duties by "consent[ing] to the attorney-in-fact engaging in

---

[252] D.I. 162 at 29–30.

[253] *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806 at *43 (Del. Ch. May 19, 2020).

[254] *See* D.I. 158 at 56–58, D.I. 162 at 29–30.

[255] *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1992).

an interested transaction after full disclosure."[256] Stated another way, "[a] self-dealing transfer of the principal's property to the attorney-in-fact is voidable in equity unless the attorney-in-fact can show that the principal voluntarily consented to the interested transaction after full disclosure."[257] "Such consent requires impartial advice from a competent and disinterested third person."[258] Thus, once a self-dealing transaction is challenged, the burden is on the fiduciary to demonstrate that the transaction should be upheld.[259]

Here, the Respondent and Ms. Vogel unquestionably engaged in several self-dealing transactions. The Respondent's justification for those transactions is that Ms. Harker wanted him to have whatever he wanted, and to live a full life. This attitude is understandable given the uncontested record of Ms. Harker's doting upon the Respondent. But it does not suffice to excuse the Respondent's self-interested dealings once he was appointed as a fiduciary for Ms. Harker. With the Second POA and extended into the Third POA, the Respondent was required to put Ms. Harker's interests first. He failed to do so, and there must be consequences.

Looking to the various transactions undertaken by the Respondent as agent, the Respondent's overarching response that Ms. Harker wanted him to live freely is

---

[256] *Id.* at 225.

[257] *Faraone v. Kenyon*, 2004 WL 550745, at \*11 (Del. Ch. Mar. 15, 2004).

[258] *Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007).

[259] *Pennewill v. Harris*, 2011 WL 691618, at \*3 (Del. Ch. Feb. 4, 2011).

wholly insufficient to demonstrate that Ms. Harker was informed and consented to any of the transactions, particularly given the lack of any impartial advice from disinterested third parties. Thus, the Respondent should be required to return the value of all the self-interested transactions to Ms. Harker's estate.

The same is true for transactions which were undertaken by, or for the benefit of, Ms. Vogel. As addressed above, Ms. Vogel was held in default. The consequences of that default do not change my above findings regarding Ms. Harker's estate planning documents. But they do justify judgment against Ms. Vogel for her role in the self-interested transactions she undertook in her admitted fiduciary capacity. Ms. Vogel's ill-gotten gains must also be returned for the benefit of Ms. Harker's estate.

F.    **The Petitioner failed to prove that the Respondent was unjustly enriched by the withdrawal of the Edward Jones Account.**

The Petitioner challenges the $413,200.00 withdrawal from the Edward Jones Account under the theory of unjust enrichment. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[260] To succeed on her unjust enrichment claim, the Petitioner must prove by a preponderance of the evidence: "(1) an enrichment, (2) an

---

[260] *Schock*, 732 A.2d at 232 (citation and quotation marks omitted).

impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[261] "The fifth element need only be established if there is a dispute over jurisdiction[,]" which is not relevant here.[262]

Here, there was an enrichment (the funds withdrawn), an impoverishment (the same funds which the Petitioner can no longer access), and a relation between the impoverishment and the enrichment (evidenced by the flow of funds out of the Edward Jones Account). That leaves the question of justification. "Typically, the absence of justification element 'entails some type of wrongdoing or mistake at the time of the transfer.'"[263] Although the Respondent demanded the liquidation of the Edward Jones Account—a joint account with right of survivorship between the Petitioner and Ms. Harker—the record reflects that Ms. Harker, of sound mind, authorized the Respondent to do so.[264] Thus, the Petitioner has not demonstrated the

---

[261] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[262] *Restanca, LLC v. House of Litium, Ltd.*, 2023 WL 4306074, at *34 (Del. Ch. June 30, 2023).

[263] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *18 (Del. Ch. May 13, 2022) (quoting *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007)).

[264] *See* JX59 at 6 ("Client stated that every [transaction] made by [the Respondent] and Ashley Vogel made are authorized by her. Client stated that she is aware of these transactions."); *see also* Respondent Tr. 786:22–787:15 ("And explained to Steve that, 'Look, we're going to use one or two of these checks and then we're going to be stuck in the middle of this ocean to where, you know, now we're in the middle of a lawsuit, my mom's going to either pull the money out or do some stuff to get it frozen. And now we're going to be in the middle of this lawsuit with no oars on our boat, you know, effectively cut off from what we would need to fight the lawsuit with.' And that wasn't good. Grandma

enrichment was without justification and, as such, her unjust enrichment claim must fail. To the extent any of these funds were part of the Respondent's self-dealing transactions, however, they will be addressed by my breach finding and supplemental proceedings quantifying same.

**G.     The Petitioner's attorneys' fees should be shifted to Ms. Harker's estate.**

The Petitioner asks that her fees be shifted to the Respondent under the bad faith exception to the American Rule or, alternatively, be borne by Ms. Harker's estate. I fail to find bad faith sufficient to shift fees to the Respondent, but I find sufficient cause to shift fees to Ms. Harker's estate.

"Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[265] There are several exceptions; "[f]or example, fees may be shifted if: (i) recovery of fees is provided by statute or court rule; (ii) there is a contractual provision regarding entitlement to attorneys' fees; (iii) a party has acted in bad faith in connection with the conduct of the litigation process; (iv) a party fails to abide by a court order or is held in contempt; and (v) the

---

didn't want that. She felt like she had put me in this situation by doing the documents kind of without really talking to me about it. So she felt guilty. She felt a little bit guilty, and she felt like, you know, 'I want to make sure you're going to be okay because you made sure that I'm going to be okay.'").

[265] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

action results in the creation, protection or distribution of a common fund or confers a corporate benefit."[266] The Petitioner invokes (iii) and (v), which I address in turn.

Under the bad-faith exception, "Delaware courts have shifted fees for glaringly egregious conduct, such as forcing a plaintiff to file suit to secure a clearly defined and established right, unnecessarily prolonging or delaying litigation, falsifying records, or knowingly asserting frivolous claims."[267] This exception only applies in extraordinary cases.[268] This Court "does not invoke the 'bad faith exception' lightly and imposes the stringent evidentiary burden of producing 'clear evidence' of bad-faith conduct on the party seeking an award of fees."[269] I am not firmly convinced that the Respondent litigated this action in bad faith.[270]

The Petitioner cites to *RGC International Investments, LDC v. Greka Energy Corp.*,[271] wherein then Vice Chancellor Strine awarded attorneys' fees under the bad faith exception where the opposing party's arguments had minimal grounding in fact

---

[266] *In re Del. Pub. Schs. Litig.*, 312 A.3d 703, 716 (Del. 2024).

[267] *Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *1 (Del. Ch. July 22, 2021) (cleaned up).

[268] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015).

[269] *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER).

[270] *Cf. B.E. Cap. Mgmt. Fund LP v. Fund.com Inc.*, 2024 WL 3451459, at *18 (Del. Ch. July 18, 2024) (finding clear evidence that the party against whom fees were shifted falsified records); *Choupak v. Rivkin*, 2015 WL 1589610, at *23 (Del. Ch. Apr. 6, 2105), *aff'd*, 129 A.2d 232 (Del. 2015) (same).

[271] 2001 WL 984689 (Del. Ch. Aug. 22, 2001).

or law, made the litigation more expensive than it should have been and involved the filing of false affidavits to another court.[272] The Petitioner argues the Respondent's claims regarding the line of credit and the Edwards Jones Account were "demonstrably false and even a cursory investigation in reviewing records . . . would have shown as such."[273] I appreciate the Petitioner's comparison, but a weak claim is different than a frivolous one. And, weak as they may have been, there is no evidence that the Respondent's claims delayed or made this litigation more expensive.[274] I find bad-faith fee shifting unwarranted.

The Petitioner alternatively requests that her fees be shifted to Ms. Harker's estate under the common fund or benefit exception. These exceptions work "to balance the equities to prevent 'persons who obtain the benefit of a lawsuit without contributing to its cost [from being] unjustly enriched at the successful litigant's expense.'"[275] Under this equitable lens, this Court will shift attorneys' fees for "a party who successfully challenges a will and causes the reinstatement of a prior will

---

[272] *Greka,* 2001 WL 984689, at *19 n.111.

[273] *See* D.I. 152 at 69–70.

[274] *See, e.g., Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998).

[275] *Dover Hist. Soc'y, Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1090 (Del. 2006) (quoting *Goodrich v. E.F. Hutton Gp., Inc.,* 681 A.2d 1039, 1044 (Del. 1996)).

reflecting the decedent's true plan of disposition [and] has shown exceptional circumstances benefitting the estate."[276]

The non-prevailing side of a will contest may also receive an award of fees if probable cause to contest the will existed, exceptional circumstances were present, and the litigants' actions benefitted the estate.[277] To prove as much, the Plaintiff must be able to show "sufficient evidence to establish a prima facie case, and overcome the presumption of law that exists in favor of the will's validity."[278] Exceptional circumstances may exist where "a testatrix disinherits a blood relative in favor of a stranger, materially alters a prior testamentary scheme, or relies on advice from an interested party."[279]

The Petitioner argues for a similar application of the law as in *In re Kittila*.[280] There, the decedent materially altered her previous testamentary scheme and unexpectedly cut ties with family members. [281] Similarly, here, Ms. Harker disinherited the Petitioner who was her sole beneficiary for over a decade, with whom she had a good relationship before May 2021. Through this action, Ms.

---

[276] *In re Damico*, 2011 WL 1938567, at *13 (Del. Ch. Apr. 11, 2011).

[277] *Ableman v. Katz*, 481 A.2d 1114, 1122 (Del. 1984).

[278] *In re Kittila*, 2015 WL 3899572, at *2 (Del. Ch. June 24, 2015).

[279] *Id.*

[280] *See* D.I. 152 at 69.

[281] *Kittila*, 2015 WL 3899572, at *3.

Harker was also successful to her challenge to numerous self-dealing transactions, the recoupment of which will benefit the estate. Thus, like in *Kittila*, after "evaluat[ing [this] case based on its unique facts[,]"[282] I find the Petitioner's attorneys' fees are most appropriately borne by Ms. Harker's estate.

## IV.    CONCLUSION

For the foregoing reasons, I am: (1) declaring that the Edward Jones Account is a joint account with right of survivorship, which passed to the Petitioner in full upon Ms. Harker's death, (2) denying the Respondent's claim regarding the line of credit, (3) denying the Petitioner's undue influence, lack of capacity, and unjust enrichment claims, (4) granting the Petitioner's breach of fiduciary duty claims, and (5) shifting the Petitioner's attorneys' fees to Ms. Harker's estate.

These rulings require further action by the parties. Specifically, the parties are directed to meet and confer regarding (1) the total dollar amount of the self-interested, voided transactions and (2) a reasonable amount of the Petitioner's fees which should be shifted to the estate. The parties shall file an implementing order jointly or with any disagreements noted within 60 days of the date of this report. If the parties cannot agree on (2), the Petitioner shall submit, within the same 60-day

---

[282] *Id.*

window, an affidavit under Court of Chancery Rule 88, to which the Respondent may reply within 10 days of filing.

This is a magistrate's report and exceptions under Court of Chancery Rule 144 are stayed until my final ruling on the transactions and fees to be shifted.